[Docket Nos. 281, 282, and 284]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| THE COOPER HEALTH SYSTEM, <br><br> Plaintiff, <br><br> v. <br><br> MAXIS HEALTH SYSTEM, <br><br> Defendant, <br><br> -and- <br><br> MAXIS HEALTH SYSTEM and TRINITY HEALTH, <br><br> Counter-Plaintiffs, <br><br> v. <br><br> THE COOPER HEALTH SYSTEM, <br><br> Counter-Defendant. | Civil No. 18-702 (RMB/AMD) <br><br> **OPINION** |

**APPEARANCES**

**BROWN AND CONNERY, LLP**
Carmen Y. Day
Jonathan L. Triantos
Joseph T. Carney
William M. Tambussi
360 Haddon Avenue
Westmont, NJ 08108

*On behalf of Plaintiff/Counter-Defendant*

**BUCHANAN, INGERSOLL & ROONEY, PC**
Christopher J. Dalton
Argia J. Dimarco
550 Broad Street, Suite 810
Newark, NJ 07102

Mark A. Kasten
Two Liberty Place
50 South 16th Street
Philadelphia, PA 19102

*On behalf of Defendant/Counter-Plaintiffs*

**RENÉE MARIE BUMB, United States District Judge**

This matter comes before the Court upon the Motion for Summary Judgment as to Count I of the Complaint by Plaintiff The Cooper Health System [Docket No. 281], the Motion for Summary Judgment as to Maxis Health System's and Trinity Health's Counterclaim by Counter-Defendant The Cooper Health System [Docket No. 282], and the Motion for Summary Judgment by Defendant Maxis Health System. [Docket No. 284]. For the reasons set forth below, the motion for summary judgment as to the Counterclaim [Docket No. 282] is **CONTINUED**, in part, and **DENIED**, in part, and the two motions for summary judgment as to the Complaint [Docket Nos. 281 and 284] are **DENIED**.

## I.    FACTUAL BACKGROUND

This dispute concerns an unsuccessful corporate transaction by which Plaintiff, The Cooper Health System ("Cooper"), sought to purchase all of the membership rights, title, and interests held by Defendant Maxis Health System ("Maxis"), a division of Trinity Health ("Trinity"), as the sole corporate member of

2

two nonprofit corporations that operate acute care hospitals:  Our Lady of Lourdes Health Care Services, Inc., located in Camden, New Jersey ("Lourdes"), and St. Francis Medical Center, located in Trenton, New Jersey ("St. Francis," and collectively with Lourdes, the "Hospitals"). [Docket Nos. 281-1, at 3; 297, at 5.] In 2017, Trinity, as the sole corporate member of Maxis, "solicited proposals from potential bidders interested in purchasing Maxis' interest in Lourdes and St. Francis," and after Cooper was the only bidder to make a proposal to buy both Hospitals, Trinity selected Cooper's bid. [Docket No. 297, at 5.]

On August 31, 2017, the parties executed a letter of intent (the "LOI"), pursuant to which Trinity agreed to negotiate exclusively with Cooper for a period of ninety (90) days and discontinue discussions with all other parties interested in acquiring the Hospitals. [*Id.*] In the LOI, the parties stated that they anticipated "complet[ing] their due diligence within seventy-five (75) days" from the date thereof, and expressly provided both parties with "the unilateral right to extend the due diligence period and date for signing the Membership Transfer Agreement for an additional fifteen (15) business days upon written notice to the other Party." [Docket No. 281-1, at 3-4 (citations omitted).] Cooper also agreed to "make a good faith deposit of $15 million into an interest-bearing escrow account held by Bank of America" (the "Breakup Fee"), which Cooper acknowledges was set aside "[i]n consideration of Maxis agreeing to this exclusivity provision and in recognition of the business and operational risks inherent in the [t]ransaction." [*Id.* at 4 (citations omitted).]

3

Pursuant to the LOI, the Breakup Fee was repayable to Cooper "[i]n the event Cooper determine[d] not to proceed to execute the Membership Transfer Agreement due to a Due Diligence Issue," provided that Cooper, after identifying a "Due Diligence Issue," gave Trinity notice of the issue and also gave Trinity "the opportunity to mitigate the problem before making a determination not to proceed with the [t]ransaction." [*Id.* at 4-5 (citations omitted).] The LOI defined a "Due Diligence Issue," in relevant part, as follows:

> (a) any circumstance(s) which individually or in the aggregate involve a potential loss, exposure or liability in excess of $4,000,000 involving one or more of the following:  (i) a  potential or actual violation of state or federal laws, regulations, national or local coverage determinations involving self-referral prohibitions, kickbacks, false claims, or insurance fraud [. . .];
>
> (b) a potential or actual claim or liability not covered by insurance which individually or in the aggregate exceeds $3,000,000; or [. . .]
>
> (d) any circumstance which involves a non-routine pending or threatened third party payer action seeking a refund or could be reasonably perceived to involve a future claimed refund which, on an individual basis, exceeds $3,000,000[.]

[Docket Nos. 281-1, at 4 (citations omitted); 297, at 6 (citations omitted).]

After executing the LOI, the parties proceeded with their due diligence review. Cooper argues that it identified five (5) litigation and compliance issues impacting the Hospitals, and that the amount of potential financial exposure associated with each issue met or exceeded the applicable monetary threshold such that all five issues qualified as "Due Diligence Issues" under the LOI. Each of the five issues, identified by Cooper and responded to by Maxis, is briefly summarized below:

4

1.    **The Gonnelli Litigation**:  A former developer brought suit against St. Francis over a failed development project (the "Gonnelli Litigation"). Cooper contends that the developer sought monetary damages in an amount that totaled over $23.9 million, as well as punitive damages, attorneys' fees, interest, and other costs of litigation, and that there was no applicable insurance to cover the claim. [Docket No. 281-1, at 5.] Maxis contends that the Gonnelli Litigation was not a Due Diligence Issue under the LOI, evidenced by the fact that the matter "was settled after Cooper withdrew from the [t]ransaction, for an amount far less than was demanded in the [complaint], and below the monetary threshold used in the LOI to define a Due Diligence Issue." [Docket No. 297, at 8.]

2.    **The 340B Compliance Issue**:  Maxis admits that audits of both Hospitals for years 2015 and 2016 revealed overpayments received under what is known as the "340B Drug Discount Program," which "requires drug manufacturers to provide drugs to eligible health care organizations at reduced prices." [*Id.*] Cooper contends that the amount of overpayments made to the Hospitals under the program since 2016 exceeded $2.5 million, and that the overpayments put the Hospitals at risk of "being subject to paybacks to pharmaceutical manufacturers" and exclusion from the 340B Drug Discount Program. [Docket No. 281-1, at 5.] Maxis argues that the 340B Compliance Issue was resolved, as both Hospitals self-disclosed the issue and made the necessary repayments to applicable manufacturers. [Docket No. 297, at 8.]

3.    **The Per-Click Payment Issue**:  St. Francis entered a joint venture with Central New Jersey Heart Services, LLC in 2007. During Cooper's due diligence review, a question about whether the payment terms of the joint venture violated "prohibitions on the per-click compensation arrangements contained in the Stark [L]aw." [*Id.* at 11.] Cooper contends that "counsel for St. Francis and Maxis were of the opinion that the per-click arrangement should be revised," but Maxis argues that it provided Cooper with a legal opinion from outside counsel for Central New Jersey Heart Services, LLC that the arrangement was legal. [*Id.*; Docket No 281-1, at 5.]

4.    **Federal Grants Investigation**:  In June 2017, the Our Lady of Lourdes Health Foundation received a subpoena from the Corporation for National and Community Services and launched an investigation regarding the falsification of volunteer timesheets and volunteer background checks, which Cooper argues implicated grants made to the foundation between 2013 and 2017 in the total amount of $4.8 million. [Docket No. 281-1, at 6.] However, Maxis argues that the matter was not a Due Diligence Issue, and the matter settled for $1.1 million approximately ten months after the potential transaction was terminated. [Docket No. 297, at 9.]

5.   **The DHS Eligibility Issue**:  Maxis admits that as a participant in the New Jersey Medicaid Disproportionate Share Hospital Program, St. Francis is required to "certify that it has two obstetricians who had staff privileges at the hospital that agreed to provide obstetric services to Medicaid-eligible individuals." [Docket No. 297, at 10 (citations omitted).] Maxis argues that it met the requirement "by having obstetric trained emergency room physicians qualified to provide non-emergent obstetric services on staff," and that Cooper acknowledged during the due diligence period that the risk of a finding of noncompliance was "low" and "unlikely." [*Id.*] However, Cooper argues that a 2016 audit found that St. Francis was not in compliance, which it argues could result in St. Francis having to repay the funds received under the program from 2013 through 2017 in the total amount of $51.9 million. [Docket No. 281-1, at 6.]

The parties not only dispute whether the above five issues satisfied the definition of a "Due Diligence Issue" under the LOI, but also disagree as to the timeline of events that took place around the time their negotiations broke down.

Cooper asserts that it and Maxis participated in a long series of in-person meetings, telephone conferences, and email exchanges during the course of the due diligence period that provided Maxis with ample notice that each of the five issues were, in fact, "Due Diligence Issues" under the LOI. [*Id.* at 6-8.] Cooper also argues that it conferred with Maxis on November 13, 2017, the original expiration date of the LOI, "during which Cooper exercised its right to extend the LOI for an additional fifteen business days to December 6, 2017. . .**as a result of its identification of the five Due Diligence Issues.**" [*Id.* at 8 (emphasis added).] On December 6, 2017, Cooper's in-house counsel made a presentation to "a working group of Cooper's Board of Trustees. . .tasked with evaluating the [t]ransaction on behalf of Cooper." [*Id.* at 9.] According to Cooper, the parties then further-extended

6

the LOI as they continued to discuss the five litigation and compliance issues, first by pushing out the expiration date from December 6 to December 8, and then again on December 8 when the parties agreed to extend the LOI through December 15, 2017. [*Id.* at 9-10.] Cooper contends that between December 9 and December 14, "Maxis did not make any offers to Cooper to mitigate or attempt to mitigate the five Due Diligence Issues," at which point the working group of its Board determined not to proceed with the acquisition. [*Id.* at 10-11.] Cooper argues that it officially backed out of the deal on December 14, 2017, when "Cooper sent a letter to Maxis advising that Cooper was terminating the [t]ransaction due to the five Due Diligence Issues" and asked Maxis to return the $15 million being held in escrow. [*Id.* at 11-12.]

Maxis tells a different story, contesting Cooper's right to a return of the Breakup Fee on December 18, 2017. [*Id.* at 12.] Maxis contends that it could have easily mitigated each of the five compliance and litigation issues impacting the Hospitals simply "by listing them as excluded liabilities in the [Membership Transfer Agreement]." [Docket No 297, at 12.] Maxis also argues that during its due diligence review of the Hospitals, "Cooper became aware that the financial condition of the Hospitals was worse than Cooper believed when it entered into the LOI," and that Cooper ultimately decided to back out of the transaction because it did not "work from a financial perspective" (*i.e.*, Cooper experienced buyer's remorse and called off the deal, not because any of the five issues actually rose to the level of a "Due Diligence Issue" under the LOI). [Docket No. 297, at 14-16.] According to Maxis, "[o]n December 8, 2017, Cooper firmly advised Trinity that it would not proceed

7

with the [t]ransaction on the terms set forth in the LOI," and the parties spent the following week, through December 15, 2017, discussing the terms of a new deal. [*Id.* at 17.] Maxis contends that on December 14, 2017, Cooper conveyed a new offer to Trinity with a purchase price of $50 million, far less than the original purchase price in the LOI, which Trinity refused. [*Id.*]

## II. PROCEDURAL BACKGROUND

On December 18, 2017, Cooper filed a complaint in state court against Maxis, seeking a declaration that it was entitled to repayment of the Breakup Fee. [Docket No. 1, Ex. 1.] Maxis removed the matter to this Court on January 17, 2018. [Docket No. 1.] Maxis filed its Answer to the Complaint and a Counterclaim against Cooper on behalf of itself and Trinity on February 7, 2018. [Docket No. 8.] Cooper then filed an Answer to the Counterclaim on March 1, 2018. [Docket No. 14.] This Court granted leave, in part, for Cooper to file an amended complaint, which it did on November 19, 2018. [Docket Nos. 58, 59.] Maxis filed an Answer to the Amended Complaint and Counterclaim on December 10, 2018 [Docket No. 60], and on June 11, 2019, Cooper filed its Answer to the (Amended) Counterclaim [Docket No. 104].

Cooper moved for partial summary judgment as to Count I of its Complaint on September 18, 2018 [Docket Nos. 41-43], but Cooper's motion was administratively terminated by this Court pending the parties' participation in private mediation. [Docket No. 46.] On January 17, 2019, Cooper, Maxis, and Trinity participated in mediation, but mediation was not successful. Cooper then refiled its Motion for Partial Summary Judgment as to Count I of its Complaint [Docket No.

67], which this Court denied without prejudice on May 30, 2019 [Docket No. 101].

## III.   JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332 because there is complete diversity of citizenship between the parties

and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## IV.   LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it might impact the

"outcome of the suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland

Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would

allow a reasonable jury to find for the nonmoving party. *Id.*

The movant has the initial burden of showing through the pleadings,

depositions, answers to interrogatories, admissions on file, and any affidavits "that

the non-movant has failed to establish one or more essential elements of its case."

*Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 318 (3d Cir. 2009). "If

the moving party meets its burden, the burden then shifts to the non-movant to

establish that summary judgment is inappropriate." *Id.*

In the face of a properly supported motion for summary judgment, the

non-movant's burden is rigorous. They "must point to concrete evidence in the

record"; mere allegations, conclusions, conjecture, and speculation will not defeat

summary judgment. *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord*

*Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and

conjecture may not defeat summary judgment") (citing *Acumed LLC v. Advanced

Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

## V.    ANALYSIS

The Court considers each of the three motions for summary judgment

presently pending before it in turn based on the arguments raised by the parties.

### A.    Cooper's Motion for Summary Judgment as to Count I of its Complaint

Cooper's argument that its Motion for Summary Judgment as to Count I of its

Complaint [Docket No. 281] should be granted is based on the following four-point

rationale:  (i) Cooper identified five Due Diligence Issues (as such term is defined in

the LOI); (ii) Cooper provided notice to Maxis of the five Due Diligence Issues; (iii)

Cooper gave Maxis an opportunity to mitigate the five Due Diligence Issues; and (iv)

Cooper decided not to proceed with the anticipated transaction as a result of the five

Due Diligence Issues. [Docket No. 281-1, at 13-30.] Thus, Cooper claims that it is

entitled to repayment of the Breakup Fee as a matter of law under the clear terms of

the LOI. Maxis, however, has refuted several of the facts central to Cooper's motion.

The first and second points of Cooper's four-point rationale concern Cooper's

identification of a Due Diligence Issue(s) and providing notice of such issue(s) to

Maxis and Trinity. In its supporting brief, Cooper goes through each of the five

litigation and compliance issues impacting the Hospitals, citing a long list of emails, telephone conferences, and meetings where it first raised each of the five issues to Cooper and the parties' engaged in ongoing dialogue concerning each issue, arguing that such conversations show that Cooper identified five issues that exposed the Hospitals to an amount of potential liability in excess of the applicable three- and four-million-dollar threshold limits to constitute a "Due Diligence Issue" under the LOI. [Docket No. 281-1, at 14-19.] Relatedly, Cooper's second point is that the "numerous in-person meetings, telephone conferences, and e-mails" between the parties about the five issues also gave Maxis sufficient notice that Cooper considered these issues to be "Due Diligence Issues" under the LOI, including instances where, for example, Cooper expressly warranted to Maxis that it "doesn't see a path forward" and "hasn't seen a solution to protect them." [Docket No. 281-1, at 20 (citations omitted).] With respect to the notice requirement, Cooper further points out that the LOI contained "no requirement for written notice" as to the existence of a Due Diligence Issue; "The LOI simply provides that notice to Maxis is sufficient." [*Id.* (citations omitted).]

In opposition, Maxis argues that much of the evidence relied on by Cooper to demonstrate the materiality of the five litigation and compliance issues was "obtained in discovery of this case," such that Cooper could not have determined that the financial consequences of such issues rose to the level of a "Due Diligence Issue" under the LOI "prior to terminating the [t]ransaction." [Docket No. 297, at 19.] Maxis also argues that "the parties' **'discussion'** of matters" during the normal

11

course of negotiations is not equivalent to Cooper giving specific notice that it
intended to walk away from the anticipated transaction if certain "Due Diligence
Issues" (as defined under the LOI) were not mitigated. [*Id.* at 24 (emphasis added).]

The Court agrees with Maxis that the notice provision of the LOI would likely
not be triggered by discussions that occurred in the ordinary course of the parties'
negotiations. Cooper's argument also relies on a theory of constructive notice. Thus,
the Court finds that whether any particular conversation during the parties' back-
and-forth of a heavily-negotiated corporate transaction constituted constructive
notice that Cooper had identified "Due Diligence Issues" under the LOI and
intended to terminate the transaction if such issues were not mitigated is squarely an
issue of material fact that must be left for the jury to decide. The Court also agrees
that Cooper should not be permitted to stress the materiality of any particular legal or
compliance issue impacting the Hospitals by relying on information that was not
available to it at the time it decided to walk away from the transaction. However,
under this same rationale, Maxis cannot be permitted to downplay the materiality of
any such issue based on a resolution it was able to achieve after the deal fell through.
Regardless, whether Cooper even had sufficient information to determine that a
"Due Diligence Issue" (as defined under the LOI) existed is a issue of material fact
for another day.

Cooper's third point of its four-point rationale is that Maxis and Trinity had
an opportunity to mitigate the litigation and compliance issues impacting the
Hospitals and failed to do so. Cooper notes that "[t]he LOI connects notice to

12

mitigation, in that, once notice is provided, the 'opportunity to mitigate' is triggered." [Docket No. 281-1, at 26 (citations omitted).] Cooper also argues that even if it failed to give notice, Maxis was not capable of mitigating these issues because the potential harm posed consisted of both monetary damages and reputational harm. [*Id.* at 28.] However, Maxis has argued that it could have excluded the five litigation and compliance issues from the transaction altogether simply by defining them in the Membership Transfer Agreement as "excluded liabilities." In addition, whether Trinity and Maxis actually had an opportunity to mitigate depends, in part, on whether Cooper provided sufficient notice in the first instance. Thus, the Court finds that whether Maxis and Trinity had an opportunity to mitigate any Due Diligence Issues, insofar as they were notified of such issues and were capable of mitigation, are also disputed issues of material fact for the jury to decide.

Cooper's fourth point is that it decided not to proceed with the transaction as a result of the five "Due Diligence Issues." [Docket No. 281-1, at 29.] However, as previously discussed, Maxis has provided an alternative theory to explain Cooper's eventual withdrawal from the transaction – specifically, that the deal was not as good as Cooper originally thought (but not because the deal was as bad as Cooper now presents it to be). In the end, Cooper's argument that it is entitled to judgment as a matter of law with respect to Count I of the Complaint depends on several material facts that remain squarely in dispute among the parties. Thus, Cooper's Motion for Summary Judgment as to Count I of its Complaint is denied.

13

### B.    Maxis' Motion for Summary Judgment

Maxis argues in favor of its Motion for Summary Judgment as to the
Complaint by setting forth a four-point rationale that is almost the direct inverse of
Cooper's:  (i) the LOI unambiguously required Cooper to provide notice that it had
identified a "Due Diligence Issue" and provide an opportunity to mitigate the issue;
(ii) Cooper did not provide any such notice prior to withdrawing from the
transaction; (iii) Cooper did not provide any such opportunity to mitigate before it
decided to withdraw; and (iv) Trinity would and could have mitigated the purported
Due Diligence Issues had Cooper provided specific notice. [Docket No. 284-2, at 18-
29.] The Court has already found that several material facts remain genuinely in
dispute, many of which also underlie Maxis' four-point rationale in support of its
motion.

Maxis agrees with Cooper that the controlling language of the LOI clearly
required Cooper do three things for the Breakup Fee to be repayable:  identify a Due
Diligence Issue, notify Maxis/Trinity, and provide Trinity with an opportunity to
mitigate the issue. [*Id.* at 19-20.] One of the central disputes among the parties,
however, is when Cooper first identified to Maxis and Trinity the existence of "Due
Diligence Issues" as contemplated by the LOI. Maxis contends that it was not until
Cooper actually sent the termination letter calling off the transaction pursuant to the
terms of the LOI. [*Id.* at 20.] However, this occurred after the parties engaged in
weeks of ongoing discussions specifically about the five litigation and compliance
issues where Cooper reiterated that it was not comfortable with the potential

financial exposure and reputational harm associated with such issues. The parties also dispute whether any email, meeting, or conference, in particular, should be considered constructive notice by Cooper of a "Due Diligence Issue" under the LOI. These are questions that must be left for the jury to decide.

Maxis further argues that "[t]he LOI unambiguously defined Due Diligence Issues with reference to monetary consequences" to refute Cooper's argument that mitigation was not possible due to the reputational harm implicated by the five litigation and compliance issues. [*Id.* at 27.] This argument shows that yet another material factual issue remains in dispute that may be outcome determinative in the current case: whether the concept of "mitigation" under the LOI extends to non-monetary consequences such as reputational harm. This is also a jury question. The Court finds that in its Motion for Summary Judgment [Docket No. 248], Maxis has merely restated and/or expanded on the material factual issues that clearly remain in dispute among the parties. Thus, the Court will also deny Maxis' motion.

**C.    Cooper's Motion for Summary Judgement as to Maxis' and Trinity's Counterclaim**

The third and final motion for summary judgment presently pending before the Court is Cooper's Motion for Summary Judgment as to Maxis Health System's and Trinity Health's Counterclaim. [Docket No. 282.] After engaging in preliminary discussions regarding the potential transaction, Cooper and Trinity promptly entered into a confidentiality agreement on December 19, 2016 (the "Confidentiality

15

Agreement"), pursuant to which all confidential and non-public "Information"[1]

provided to Cooper by Trinity during the due diligence period was to be kept strictly

confidential. [Docket No. 282-2 ¶ 11.] Paragraph Three[2] of the Confidentiality

Agreement also required Cooper to destroy or return Trinity's Information (as

---

[1] The Confidentiality Agreement defines "Information" as follows:

> [A]ll financial, operational, technical and other proprietary information ... relating to the past, present and future businesses and affairs of the Party disclosing the Information (the 'Disclosing Party'), which Information is or has been provided to the other Party (the 'Receiving Party') prior to, on or after the Effective Date in connection with the Potential Transaction...[and] all information relating to the Disclosing Party's ideas or technology, supplies, cost and pricing data, budgets, financial projections, files, marketing plans or advertising materials, patient and customer data, employee, supplier, vendor and contractor lists, contracts, business methods, and proposed terms of any business plan, strategy, transaction or business relationship, and all analyses, compilations, studies or other documents prepared by the Receiving Party or its Representatives based on the Information.

[Docket Nos. 282-2 ¶ 10; 296-2 2 ¶ 60.]

[2] Paragraph Three of the Confidentiality Agreement is reproduced below:

> If the Parties do not proceed with a Potential Transaction and the Disclosing Party so requests, or if the Disclosing Party so requests at any time, the Receiving Party will destroy or return promptly to the Disclosing Party all copies, extracts or other reproductions in whole or in part of the Information in the possession of the Receiving Party or its Representatives, and the Receiving Party will destroy or cause to be destroyed all copies of any memoranda, notes, analyses, compilations, studies or other documents prepared by the Receiving Party or for its use based on, containing or otherwise reflecting any Information relating to the Disclosing Party; provided, however, that a single copy of each such item so returned or destroyed may be retained in the files of the receiving Party's legal counsel for archival purposes or to resolve any disputes that may arise under this Agreement. Such destruction shall, if requested, be certified in writing to the Disclosing Party by the Receiving Party.

[Docket Nos. 282-2 ¶ 13; 296-2 ¶ 62.]

defined in the Confidentiality Agreement) in the event the transaction was not successful. [Docket No. 282-2 ¶ 13.]

Maxis and Trinity allege in the (Amended) Counterclaim that after the transaction fell through in December 2017, Cooper filed its initial complaint in the Superior Court of the State of New Jersey and breached the Confidentiality Agreement by attaching to the complaint as an exhibit the letter Cooper sent terminating all discussions between the parties regarding the potential transaction, dated December 15, 2017, which summarized the five litigation and compliance issues impacting the Hospitals. [Docket No. 296, at 4.] Additionally, Maxis and Trinity allege that Cooper further breached the Confidentiality Agreement when it "failed to destroy or return Trinity's 'Information' (as defined in the Confidentiality Agreement), and ignored Trinity's requests for the certification of such actions as required by the Confidentiality Agreement." [Docket No. 296, at 1.]

The parties do not dispute that the (Amended) Counterclaim alleges actual damages "in an amount to be determined at trial but in excess of $75,000.00," as well as includes a broad prayer for "such other relief as the Court deems proper, including attorneys' fees and costs." [Docket No. 60, at 13-14.] Cooper argues that Maxis' and Trinity's failure to identify and calculate damages resulting from Cooper's alleged breach of the Confidentiality Agreement is fatal to their (Amended) Counterclaim. [Docket No. 282-1, at 13-22.] Cooper contends that in their Rule 26 Initial Disclosures, Maxis and Trinity specifically limited damages on their Counterclaim to

17

compensatory damages *only* with the following statement:

> In their counterclaim, Maxis and Trinity seek recovery of compensatory damages in excess of $75,000 for Cooper's breach of the Confidentiality and Non-Disclosure Agreement. Specifically, Maxis and Trinity seek damages in excess of $75,000, including court costs and attorney fees, for the damages they have suffered by Cooper's willful public disclosure and misrepresentation of Maxis and Trinity's sensitive and confidential Information.

[Docket No. 309, at 7 (citing Docket No. 282-18, at 3-4).] In response to Cooper's interrogatories for additional information, Maxis and Trinity further stated that "[t]he calculation of damages and methodology used in that calculation will be the subject of expert analysis." [Docket No. 282-1, at 17 (citations omitted).] However, the time for Maxis and Trinity to produce a damages expert has long passed. The applicable Scheduling Order entered by the Honorable Ann Marie Donio required all affirmative expert reports and expert disclosures pursuant to Fed. R. Civ. P. 26(a)(2) to be served by April 14, 2021. [Docket No. 267 ¶ 6.] As Cooper correctly points out, "Maxis and Trinity never produced an expert, and never provided any computation of damages." [Docket No. 282-1, at 17.] Thus, Cooper contends that "Maxis and Trinity have not suffered any damages," and that the Court should reject any argument that Maxis and Trinity are entitled to proceed with the (Amended) Counterclaim to recover nominal damages because nominal damages "were not pled or asserted in discovery." [*Id.* at 19.]

In response, Maxis and Trinity argue that the (Amended) Counterclaim should be allowed to proceed because "a broad prayer for relief can support a claim for nominal damages even where a party has (1) been unable to support a calculation

18

of actual damages and (2) not explicitly requested nominal damages in its pleading."

[Docket No 296, at 12.] Maxis and Trinity contend that the Third Circuit "point[s] to

a request for actual damages coupled with a broad prayer for relief as sufficient to

seek nominal damages." [*Id.* at 13 (citing *Barsista v. Weir*, 340 F.2d 74, 87 (3d Cir.

1965).] However, the Court finds that Maxis' and Trinity's reliance on *Barsista* is

misplaced. In *Barsista*, the plaintiff brought allegations that his civil rights had been

violated after a police officer allegedly struck him in the back of the head without

provocation. *Barsista*, 340 F.2d at 77. The pertinent issue before the Third Circuit

was whether "there can be no exemplary or punitive damage where actual damage is

not shown." *Id.* at 85. The Third Circuit explained that "[a]s a matter of federal

common law it is not necessary to allege nominal damages and nominal damages are

proved by proof of depriviation[sic] of a right to which the plaintiff was entitled." *Id.*

at 87. Here, however, the (Amended) Counterclaim alleges a claim for breach of

contract, which arises under New Jersey law and does not concern the deprivation of

any constitutional or otherwise federal rights. Therefore, the Court finds that the

federal common law governing whether nominal damages have been properly pled

in the context of civil rights violations is inapplicable.

The Court agrees with Cooper that the current dispute is more analogous to

*Dunkin' Donuts Inc. v. Dough Boy Mgmt. Inc.*, 2006 WL 20521, Civ. No. 02-243 (JLL)

(D.N.J. Jan 3, 2006). In *Dunkin'*, the underlying action was for breach of contract

after plaintiffs allegedly failed to pay franchise and advertising fees, maintain

accounting records, and were operating two additional locations without franchise

agreements, among other things. *Id.* at *2. Just like in the current controversy, the plaintiffs in *Dunkin'* argued "that neither [d]efendants' [i]nitial [d]isclosures nor [a]nswers to [i]nterrogatories provide either a dollar amount of their alleged damages or a computation thereof," and that "[d]efendants' counterclaims must fail as a matter of law" after this Court granted plaintiffs' motion to strike the testimony of defendants' damages expert. *Id.* at *3, 7 (cleaned up). This Court properly recognized in *Dunkin'* that the issue "is really one about damages—whether [p]laintiffs can demonstrate through admissible evidence sufficient facts that would permit a jury to arrive at an intelligent damages estimate without speculation or conjecture." *Id.* at 7. Like the defendants in *Dunkin'*, Maxis and Trinity "'must establish [their] claim upon a solid foundation in fact, and cannot recover when any essential element is left to conjecture, surmise or hypothesis' [as] '[d]amages must nevertheless be proven and not left to speculation.'" *Id.* (first quoting *White Spot Constr. Corp. v. Jet Spray Cooler, Inc.*, 344 Mass. 632, 183 N.E.2d 719, 722 (Mass.1960); then quoting *Hendricks & Assoc., Inc. v. Daewoo Corp.*, 923 F.2d 209, 217 (1st Cir.1991)). This Court then went on to state the following regarding whether the defendants should be permitted to pursue nominal damages on their breach of contract counterclaim before dismissing all of defendants' counterclaims "that are contingent on an element of damages":

> Defendants argue that if they cannot demonstrate their damages, they are still
> entitled to nominal damages and attorneys' fees. While Massachusetts law
> would permit Defendants to at least nominal damages for a breach of a
> contract, where no actual damages are proven, *Damiano v. National Grange
> Mut. Liability Co.*, 316 Mass. 626, 56 N.E.2d 18, 20 (Mass.1944), Defendants
> here never pled a claim for nominal damages, nor asserted such a claim in

20

discovery. Further, Defendants' general prayer for relief does not suffice. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 71, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("a claim for nominal damages, extracted late in the day from [plaintiffs] general prayer for relief and asserted solely to avoid otherwise certain mootness, [bears] close inspection"). It appears evident to this Court that Defendants newfound claim for nominal damages arises out of a failure to ultimately prove actual damages and a desire to ultimately obtain attorneys' fees. At oral argument, defense counsel explained that if a jury would not give them actual damages, "[t]hen the jury could say give them nominal damages for that, and we are entitled to attorneys' fees and costs which we had to incur. (citations omitted). "At the very least, the nominal damages argument is foreclosed by dictates of Judicial Estoppel." *A.P. Boyd, Inc. v. Newark Pub. Sch.*, 44 Fed. Appx. 569, 571–72 (3d Cir.2002) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him ... This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.") (internal citations omitted)). Thus, Defendants are precluded from resorting to nominal damages when, all throughout discovery, Defendants only alleged actual and consequential damages. Furthermore, if Plaintiffs knew that Defendants' were seeking solely nominal damages on their claims, Defendants' counterclaims may have been settled long ago, hence avoiding unnecessary discovery, motion practice, and expert reports.

*Id.* at 9, 10 (cleaned up).

In the current dispute, the Court finds that Maxis' and Trinity's argument that their (Amended) Counterclaim should proceed is based almost entirely on their right to pursue nominal damages. The fact that Maxis and Trinity are now hanging their hat on a claim for nominal damages this late in the litigation is concerning to the Court and appears to arise from Maxis' and Trinity's failure to prove any actual or compensatory damages in discovery. "In the alternative, Trinity requests leave to amend its Counterclaim to assert a claim for nominal damages." [Docket No. 296, at

17.] However, Cooper is correct that "after the deadline in a district court's scheduling order has passed, the "good cause standard of Rule 16(b)(4) of the Federal Rules of Civil Procedure applies. A party must meet this standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard." *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020). The deadline by which Maxis and Trinity should have sought to further amend their (Amended) Counterclaim to include a prayer for relief of nominal damages was more than three years ago on May 31, 2018. [Docket No. 15, at ¶ 2.] Moreover, "[a] district court may deny leave to amend a complaint where it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith, or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *U.S. ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014) (citations omitted).

In a footnote in its supporting brief, Cooper also argues that "Maxis does not have standing to bring a claim for breach of the Confidentiality Agreement because Maxis was not a party to the Confidentiality Agreement." [Docket No. 282-1, at 13, n.2.] Cooper is also correct that "Maxis and Trinity do not dispute or even respond to this assertion." [Docket No. 309, at 11.] However, this Court has previously recognized that "litigants should not bury critical arguments in footnotes." *Hudson Marine Mgmt. Servs., Inc. v. Thomas Miller (Miami) Inc.*, Civ. No. 05-5197(WJM), 2006 WL 1995131, at *4, n.2 (D.N.J. July 14, 2006). Thus, the Court will reserve on the issue as to whether Maxis has standing to bring the Counterclaim for breach of the

Confidentiality Agreement. By no later than January 14, 2022, Maxis and Trinity shall show cause by written submission filed on the docket to address the following two issues:  (1) whether they can satisfy the "good cause" requirement under Rule 16(b)(4) to amend the Counterclaim to include a prayer of relief for nominal damages, including an explanation as to why the Court should not deny such request for undue delay, bad faith, dilatory motives, or because the amendment would be futile or prejudicial to Cooper; and (2) whether Maxis has standing to bring the Counterclaim.

In addition to the damages argument, Cooper also argues that there are three reasons why the Court should find as a matter of law that it did not breach the Confidentiality Agreement:  (i) Cooper was permitted to file its state court complaint "with the attachment of all referenced and supporting documents," including the termination letter that described the five litigation and compliance issues impacting the Hospitals; (ii) the termination notice does not include confidential "Information" (as defined under the Confidentiality Agreement); and (iii) Cooper has previously certified compliance with Paragraph Three of the Confidentiality. [Docket No. 282-1, at 22-30.] However, the Court rejects these arguments and does not find them persuasive.

First, the Court notes that although the New Jersey Rules of Court generally permit the attachment of supporting documentation to a complaint, Cooper should have known to exercise greater caution. After all, Cooper entered into the Confidentiality Agreement to gain access to sensitive information concerning the

23

affairs of the Hospitals, and such information as it related to the five litigation and compliance issues eventually caused Cooper to walk away from the deal. At a minimum, Cooper should have filed the termination letter under seal. Second, the Court finds that there is a genuine dispute regarding whether the summaries in the termination letter describing the five litigation and compliance issues constitute confidential "Information" as defined under the Confidentiality Agreement, which is a material fact central to the resolution of the (Amended) Counterclaim, and must be left for the jury to decide. Finally, the Court is not persuaded that Cooper's responses to interrogatories merely stating that it has complied with Paragraph Three of the Confidentiality Agreement are sufficient to show that Cooper actually took the requisite steps to destroy and return Trinity's confidential Information after the transaction was called off as required by the Confidentiality Agreement.

## VI.   CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment as to Count I of the Complaint by Cooper [Docket No. 281]and the Motion for Summary Judgment (as to the Complaint) by Maxis [Docket No. 284] are DENIED. The Motion for Summary Judgment as to Maxis Health System's and Trinity Health's Counterclaim by Counter-Defendant The Cooper Health System [Docket No. 282] is CONTINUED, in part, and DENIED, in part. Counterclaim Plaintiffs Maxis and Trinity shall have until January 14, 2022 to show cause by written submission filed on the docket why Cooper's motion as to the Counterclaim should not be granted, in part, consistent with this Court's Opinion. Given that this is one of the Court's oldest

cases, the parties shall also propose dates for trial to commence in March 2022 by

joint letter submission to be filed on the docket no later than January 14, 2022.


<u>December 14, 2021</u>                                              <u>s/Renée Marie Bumb</u>
Date                                                                       Renée Marie Bumb
                                                                           U.S. District Judge